762 So.2d 302 (2000)
Sheila Fox MILLER, Peggy Fox Watz and Gary Merkell Fox, Next Friends and Sole Beneficiaries of the Intestate Estate of M. Merkell Fox
v.
W. Mark MEEKS, M.D.
No. 1999-CA-00210-SCT.
Supreme Court of Mississippi.
June 29, 2000.
*303 Barry Stuart Zirulnik, Jackson, James Frederick Ahrend, Gulfport, Attorneys for Appellants.
C. York Craig, Jr., Stuart G. Kruger, Jackson, Attorneys for Appellee.
EN BANC.
MILLS, Justice, for the Court:

STATEMENT OF THE CASE
¶ 1. This case comes on appeal from the Circuit Court of Hinds County. A medical malpractice complaint was filed by Merkell M. Fox against Dr. W. Mark Meeks on February 28, 1995, alleging medical malpractice by Dr. Meeks in his treatment of Fox in 1994. Fox died intestate, and the sole beneficiaries of his estate, Sheila Fox Miller, Peggy Fox Watz and Gary Merkell, "the plaintiffs," were substituted as parties in the lawsuit. Discovery was conducted for a period of approximately three years. The circuit court granted a motion for summary judgment on the basis that Dr. Meeks was an employee of the University of Mississippi Medical Center (hereafter UMMC) and that the applicable statute of limitations had run under the Mississippi Tort Claims Act, Miss.Code Ann. §§ 11-46-1 to -23 (Supp.1999), prior to the filing *304 of the complaint. The plaintiffs filed a Notice of Appeal so that this Court could consider whether the granting of summary judgment was proper.
¶ 2. According to the transcript of the motion hearing, the plaintiffs sought to question Dr. Meeks, who was present under subpoena, regarding his employment status at the hospital, and particularly as to whether he was solely an employee of the hospital. At this point in the proceedings the trial judge made the following pronouncement:
THE COURT: Let me stop you. I need to deal with him because here's what I've done consistently in these cases and here's why. Unless I've been in a coma the last three years and just woke up, let me tell you what I've been doing. I've never been able to determine whether any doctor was an employee of the University or not.
Every time I get one of these cases I invite people to appeal me and I invite the Mississippi Supreme Court to tell me finally whether or not these doctors who work at the University Medical Center are employees of the University Medical Center or are in private practice. Because every single one of them works for the University Medical Center but then has some contract which allows that he engage in private practice and it allows that all above a certain amount of income accrues to him and he can have it. And so it walks, it talks and feels just like a private practice except that when they get sued, they stand behind this shield of immunity and then I'm a State employee. But let me make all the money I can make in this practice under the terms of my contract with the State. So I've never known whether or not they're employees of the State or whether or not they're in private practice.
So every time I get one of these cases I say please, please, I'm putting it on the record, I don't know, Supreme Court. Please tell me who these doctors actually work for ...

STANDARD OF REVIEW
¶ 3. For a summary judgment motion to be granted, there must exist no genuine issues of material fact, and the moving party must be entitled to judgment as a matter of law. Miss. R. Civ. P. 56(c). The standard of review of a lower court's grant of a summary judgment motion is de novo. Short v. Columbus Rubber & Gasket Co., 535 So.2d 61, 63 (Miss.1988). The burden of demonstrating that there is no genuine issue of material fact falls on the party requesting the summary judgment. Id. at 63-64. The court must carefully review all evidentiary matters before it; admissions in pleadings, answers to interrogatories, depositions, affidavits, etc., in the light most favorable to the party against whom the motion for summary judgment is made. McFadden v. State, 542 So.2d 871, 874 (Miss.1989). Issues of fact sufficient to require a denial of a motion for summary judgment are obviously present where one party swears to one version of the matter in issue and another says the opposite. American Legion Ladnier Post No. 42 v. Ocean Springs, 562 So.2d 103, 106 (Miss.1990). If any triable facts exist, the lower court's grant of a summary judgment will be reversed; otherwise the decision will be affirmed. Brown v. Credit Ctr., Inc., 444 So.2d 358, 362 (Miss.1983). When a motion for summary judgment is made and supported as provided in Rule 56, an adverse party may not rest upon the mere allegations or denials of his pleadings, his response must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him. If any triable issues of fact exist, the lower court's decision to grant summary judgment will be reversed. Otherwise, the decision is affirmed. Id. An issue of fact may be present where there is more than one reasonable interpretation of undisputed testimony, where materially *305 different but reasonable inferences may be drawn from uncontradicted evidentiary facts, or when the purported establishment of the facts has been sufficiently incomplete or inadequate that the trial judge cannot say with reasonable confidence that the full facts of the matter have been disclosed. Dennis v. Searle, 457 So.2d 941, 944 (Miss.1984).

STATEMENT OF THE LAW

1. DID THE TRIAL COURT PROPERLY DETERMINE THAT THERE WAS NO GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER OR NOT DR. MEEKS WAS AN EMPLOYEE OF THE UNIVERSITY MEDICAL CENTER AND THAT HE WAS THEREFORE ENTITLED TO SOVEREIGN IMMUNITY UNDER THE MISSISSIPPI TORT CLAIMS ACT?
¶ 4. The record reveals that in his employment contract with UMMC, Dr. Meeks is referred to as "the employee." The circuit court found that at the time of the alleged negligence Dr. Meeks was an employee of the State of Mississippi under Miss.Code Ann. § 11-46-1. The circuit court held that the lawsuit against Dr. Meeks was barred because it had not been filed within the applicable one-year statute of limitations as set forth in Miss.Code Ann. § 11-46-11.
¶ 5. The plaintiffs note that on two occasions bills have been introduced in the Mississippi Legislature seeking to alter the term "employee" to include "interns, residents and fellows at UMMC and all other physicians employed by the state or political subdivision...." All such efforts have failed to be enacted into law. The plaintiffs interpret this failure to indicate the legislative intent not to include physicians on the faculty of UMMC under the sovereign immunity shield. They claim that Dr. Meeks, as a physician or faculty member at UMMC, is not an employee within the meaning of Miss.Code Ann. § 11-46-1. They argue that since the Legislature did not specifically name physicians in the statute, the solons did not intend to include physicians in the definition of "any employees." This argument is clever, but flawed, because the statute defines an employee as "any officer, employee or servant of the State of Mississippi or a political subdivision of the State," with the exception of those acting as "independent contractors" under contract to the state or a political subdivision. Miss Code Ann. § 11-46-1(f). We decline to infer negative legislative intent solely because the lawmakers chose not to enumerate a laundry list of state "employees." To the contrary, we note that such physicians are not specifically excluded either. Where a statute is clear and unambiguous, no further statutory construction is necessary and the statute should be given its plain meaning. City of Natchez v. Sullivan, 612 So.2d 1087, 1089 (Miss.1992). The enacted statute speaks plainly. Immunity is extended to any state employee who is not acting as an independent contractor.

2. DID THE TRIAL COURT PROPERLY DETERMINE THAT THE TREATMENT PROVIDED BY DR. MEEKS TO MR. FOX WAS PERFORMED IN THE COURSE OF HIS DUTIES AS AN EMPLOYEE OF UNIVERSITY MEDICAL CENTER, RATHER THAN IN HIS OWN PRIVATE PRACTICE?
¶ 6. The plaintiffs concede that Dr. Meeks is a professor at UMMC, and thus an employee of UMMC. They insist, however, that it is not in his capacity as a professor that he is being sued. The plaintiffs claim that Dr. Meeks "wears two hats." Under the first hat Dr. Meeks is a professor, and employee, of UMMC training and teaching medical students. Under the second hat the plaintiffs claim that Dr. Meeks holds himself out as a private practitioner and that when he sees patients in the outpatient clinic as a member of the University of Mississippi Clinical Association ("Association") he is actually engaged in the private practice of medicine at a *306 private clinic. The plaintiffs argue that the MTCA does not apply to activities undertaken under the auspices of the Association since such activities do not occur within the course and scope of UMMC employment responsibilities. They state that since they seek relief for alleged malpractice while the physician was wearing this second hat, the MTCA should not apply.
¶ 7. The order granting summary judgment finds that Dr. Meeks is an employee under the MTCA and enjoys sovereign immunity under the MTCA. No finding was made to determine whether Dr. Meeks "wore two hats." In other words, did he practice private medicine while also serving as an employee of UMMC?
¶ 8. Dr. Meeks entered into an employment contract with UMMC in April, 1993. Under the terms of this agreement, Dr. Meeks was paid a base salary of $77,279.00 with the right to earn 100% of additional income generated through fees up to $140,000, inclusive of the base salary, and 50% of any additional fees thereafter.
¶ 9. The private practice alleged by the plaintiffs on the part of Dr. Meeks took place in the "UMMC Pavilion," an outpatient clinic on campus at UMMC. The record reveals that the UMMC Pavilion is not a "private clinic" as ordinarily defined. UMMC exercises considerable control over the treatment of patients at the clinic. UMMC also exercises control administrative duties such as funding, fee collection, record keeping and the like. Specifically, UMMC generated the bills and collected the payment for professional services rendered by Dr. Meeks during his time with the Association. Article X, Section 6 of the by-laws of the Association provides that fees for professional services may be collected directly by the clinic, under the auspices of the University Medical Center, from patients or from third-party carriers. The fees collected are deposited into an account maintained by the business manager of the Association, with such funds to be used to defray the expenses of operating the clinic.
¶ 10. Dr. Meeks states in his affidavit that he was required to report his collections from patients treated through the Association so that UMMC could monitor his income under the contract. These records were subject to audit by the Vice Chancellor of Health Affairs. In this case the decedent, Fox, was billed through the Division of General Internal Medicine at UMMC. Dr. Meeks also states in his affidavit that UMMC controlled the patients he treated and did not allow him to treat or terminate treatment of a patient, even if the patient could not pay for that treatment. Dr. Meeks further claims that he is prohibited by UMMC from admitting patients to any facility other than UMMC, and that he is prohibited from operating as a primary treating physician at any hospital but UMMC. In other words Dr. Meeks claims that UMMC controls the entire relationship. The question we must determine is whether these averments are consistent with other facts deduced from the record. Specifically, we must glean from the record those reasonably interpreted factors which indicate whether Dr. Meeks was an employee of UMMC or an independent contractor insofar as his treatment of Mr. Fox was concerned.
¶ 11. According to his own affidavit, Dr. Meeks states that beyond his base salary of $77,279 he is allowed to keep 100% of the fees he charges patients as long as his total earnings fall below a maximum of $140,000. Any additional amounts charged beyond this $140,000 are divided equally between Dr. Meeks and UMMC. At this point, the line between private practice and state employee begins to blur. The plaintiffs point out that as a member of the Association, Dr. Meeks is able to substantially increase his income, yet he remains shielded behind the MTCA because of his employee status in a state teaching hospital. The trial judge cogently observed: "And so it walks, it talks and feels just like a private practice except that when they *307 get sued, they stand behind this shield of immunity and then I'm a State employee."
¶ 12. Fox was issued an appointment card for his visits to Dr. Meeks. The card had written upon it "UMMC PAVILION" and immediately below in parentheses "(Private Clinic)." Fox's daughter, a plaintiff in this suit, submitted an affidavit stating that whenever she accompanied her father to the clinic there were never any student residents present, and that at all times Dr. Meeks held himself out to be a private practitioner.
¶ 13. Under his agreement with UMMC, Dr. Meeks must submit a "Private Practice Income Report" once a year. On his 1994 1040 tax return Dr. Meeks listed $66,637 as "wages, salaries, tips etc." and $80,916 as partnership income from "University Internal Medicine Associates." Dr. Meeks paid a "self-employment tax" in the amount of $2,176 on this partnership income. On his 1993 income tax return, $54,720 was reported as derived from a partnership, this time from the "Division of General Medicine." A self-employment tax was also paid on this amount. It appears obvious that Dr. Meeks is paid a base salary by UMMC which he reports as "wages, tips, salaries etc." Beyond this base salary he receives additional income which he declares for tax purposes as partnership income and for which he pays taxes as a "self-employed" person. This additional income is derived from the Association (UMMC Pavilion) which the plaintiffs contend is a private clinic, and which they contend was represented to Fox as a private clinic by Dr. Meeks.
¶ 14. The summary judgment hearing was somewhat unusual in that Dr. Meeks was called to the witness stand after the trial judge agreed to permit questioning on his employment status for a limited period of time. Dr. Meeks was cross-examined by the plaintiffs' attorney as follows:
Q. Let me hand you your '93 and '94 tax returns. For the year 1993, you have on here on line 7, wages salary and tips that are reported on your W 2, how much is on that?
A. $66, 766.
Q. And that's for your employment as a professor at the University Medical Center. Correct?
A. I think that's correct?
Q. Well, look on the next page. Your W-2 is attached showing that you made at UMC as an employee $59,723. Correct?
A. Right.
Q. Also, you come down to line 18 showing that your partnership income from your private practice is $54,288. Correct?
A. That's correct.
Q. And in order to come up with that figure, you had to file a separate Schedule E for your partnership income. Is that correct?
A. I can't tell you that for sure.
Q. Here it is.
A. The Schedule E for, yes, I see it.
Q. That's where you reported to the IRS how much you made in your partnership, in your private practice, for the division of general medicine. Is that correct?
A. That's the same monies.
Q. And, also, if you'll turn two pages over, you also filed a Schedule SE self-employment tax. Is that correct?
A. That's correct.
Q. So you have to pay self-employment tax on the money that you make in your private practice don't you?
A. That's correct.
Q. So UMC does not pay that self-employment tax for you.
A. No, they don't.
Q. And you report to the IRS that's your private practice income?
A. Yes. It's self-employment income.
¶ 15. The Constitution and Bylaws of the University of Mississippi Clinical Associates clearly state that only full-time physicians, *308 dentists and other clinicians employed by UMMC may be members of the Association. Association member earnings are derived wholly or in part from fees charged to patients for professional services within the University and its outpatient departments under authority granted by the UMMC Board of Trustees. (Article III, Sections 1 and 2). Patient care is to be promoted "within the University Medical Center" (Article II Sections 3 and 4). Authority over the affairs of the Association such as determining policy, employing personnel, authorizing projects and long-range planning are to be determined by the entire membership of the Association. However, this authority is "subject to limitations imposed by administration of the University Medical Center, University, Board of Trustees, Institutions of Higher Learning." (Article X Section 1). Ultimate control of the clinic rests in UMMC, even though the individual members of the Association are given considerable latitude in its administration. Article X, Sections 2 and 4 refer to the clinic as a "private outpatient clinic." Article X, Section 6 states that the outpatient clinic may collect fees "under the auspices of UMMC" from private patients or third party carriers for services, use of equipment, and expendable supplies consumed. Article X, Section 7 states in pertinent part:
All employees of the clinic shall be employees of the University Medical Center, subject to the same regulations and requirements as all other employees and shall be recipient of all benefits to which Medical Center employees are entitled. Pay of employees shall be from the account maintained by the business manager of the Association and funded by the assessment of the Association members and by fees collected by the clinic.
¶ 16. Members of the Association hold advantages over their counterparts in private practice. While ultimately under the authority of UMMC, Association members enjoy considerable flexibility in how to carry out their work and can gain considerable income in excess of their base salaries through the "partnership" arrangement with the Association. Yet, unlike their counterparts in pure private practice, such doctors continue to seek the protections of the Mississippi Tort Claims Act when claims are made against them. In fact, the Attorney General for the State of Mississippi has issued an advisory opinion stating that staff physicians under contract with UMMC are employees of the State of Mississippi, and that the medical center is responsible for affording them a defense and paying any judgment against them or settlement for any claim arising out of an act or omission within the course and scope of their employment, and within the limits of the MTCA. Miss. Att'y Gen. Op. No. 98-0500 (Sept. 4, 1998). This opinion notwithstanding, we have not yet addressed the issue of whether doctors in such arrangements are solely UMMC employees. Hence, there is no controlling precedent on this issue. In Owens v. Thomae, 759 So.2d 1117 (Miss.1999), a medical malpractice case stemming from an allegedly avoidable leg amputation, we recently discussed the employment status of Dr. Thomae. Finding the employment status of Dr. Thomae vis-a-vis the hospital unclear at the time of the surgery, summary judgment was reversed and the case remanded for further discovery to determine whether he was entitled to the protections of the Tort Claims Act. In Pickens v. Donaldson, 748 So.2d 684 (Miss.1999), a medical malpractice case involving a complaint against three doctors, this Court did not presume or proclaim that staff physicians at UMMC are automatically employees for the purposes of the MTCA, but remanded for further discovery on the issue. We also made reference to the Mississippi Attorney General's opinion in that case and its discussion of whether doctors at UMMC may not be solely compensated by the state:
The larger question may be whether the staff doctors treated this patient as independent contractors, charging fees *309 for the services separate and apart from what was charged by UMC. Pickens argues that he requested that full discovery should continue and that summary judgment is not a proper vehicle for resolution. Pickens is primarily referring to the purchase of liability insurance, rather than whether all three doctors were employees of UMC and thus protected by the MTCA. Regardless, we note that although the issue of the doctors dismissal because allegedly they are all employees of UMC is rather clear regarding Dr. Vig, it is not so clear concerning Drs. Donaldson and Causey. There is some evidence in the record that Drs. Donaldson and Causey may not be "employees" for the purposes of the Act. In an Attorney General's opinion cited in the physicians' brief and included as an appendix thereto, there is an explanation that staff physicians at UMC are not compensated solely by the State. Miss. Att'y Gen. Op. No. 98-0500 (Sept. 4, 1998). Additionally, the motions for summary judgment on behalf of Drs. Donaldson and Causey contain supporting affidavits which mention the employment contracts of the staff physicians, but those contracts are not found in the appellate records of this case. Those contracts might shed further light on this subject. It should also be noted that Dr. Vig makes the distinction that she is not a staff physician, unlike Drs. Donaldson and Causey, underscoring that she is clearly an employee of the University, and thus protected by the MTCA. There is some question in the record that Drs. Donaldson and Causey may not be covered by the MTCA. Because there is insufficient evidence in the record to make the legal determination of Drs. Donaldson and Causey's employment status and whether the MTCA is applicable, this case is remanded for additional discovery on the issue.
Id. at 688.
¶ 17. Thus we found that the employment status of staff physicians in a situation who may not have been compensated solely by the state was a question of fact. In this case a genuine issue of material fact exists regarding whether the treatment provided by Dr. Meeks to Fox was performed in the course of his duties as an employee of UMMC rather than in his own private practice. Therefore, summary judgment in favor of Dr. Meeks on this issue was not warranted.
¶ 18. The specific issue to be determined is whether faculty physicians of UMMC who engage in clinical outpatient practice under the general auspices of the University, for which they are compensated, are state employees acting within the course and scope of their employment for purposes of the MTCA. This question evades ready explication. Under Miss. Code Ann. § 11-46-1(f) (Supp.1999), if Dr. Meeks is found to be an independent contractor, he is not entitled to the protection of the MTCA. The MTCA, with a few enumerated exceptions, explicitly excludes independent contractors from its provisions. Pursuant to § 11-46-1(f), an employee is defined as follows:
"Employee" means any officer, employee or servant of the State of Mississippi or a political subdivision of the state, including elected or appointed officials and persons acting on behalf of the state or a political subdivision in any official capacity, temporarily or permanently, in the service of the state or a political subdivision whether with or without compensation. The term "employee" shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the state or a political subdivision; provided, however, that for purposes of the limits of liability provided for in Section 11-46-15, the term "employee" shall include physicians under contract to provide health services with the State Board of Health, the State Board of Mental Health or any county or municipal jail facility while rendering services under such contract.... *310 Miss.Code Ann. § 11-46-1(f) (Supp.1999). Unfortunately, this definition provides little guidance on the best means for determining the employment status of Dr. Meeks.
¶ 19. The general factors to be considered in determining employee/independent contractor status are delineated in Richardson v. APAC-Mississippi, Inc., 631 So.2d 143, 150 (Miss.1994). Historically, in our jurisprudence, the primary factor has been the degree or right to exercise control by the principal. See Mississippi Employment Sec. Comm'n v. PDN, Inc., 586 So.2d 838, 842 (Miss.1991). Application of the Richardson factors has proven quite troublesome in evaluating the relationship between the University and its faculty physicians who treat private individuals from whom they directly or indirectly receive compensation. The lower courts have consistently encouraged this Court to address this issue in greater detail.
¶ 20. Application of the Richardson test, which emphasizes the "control" factor does not conclusively establish whether Dr. Meeks was an employee or an independent contractor under the record before us. Therefore the order granting summary judgment was inappropriate. The determination of whether the MTCA applies is fact-sensitive, though the question of the applicability of the MTCA is as much a question of law as of fact. See Pickens, 748 So.2d at 688-89 (Miss.1999). The traditional scope of employment analysis fails to provide sufficient guidance to the bench and bar on this issue. Since our analysis of this case is framed by statutory provisions, in addition to private agreements, we therefore look to our sister state, Virginia, for guidance. In James v. Jane, 221 Va. 43, 282 S.E.2d 864 (1980), the Virginia Supreme Court faced the issue of whether faculty physicians of the University of Virginia Medical Center were protected by sovereign immunity for acts of simple negligence. In response to this question, the Virginia Supreme Court crafted a four-part test to determine whether state employed physicians should be granted sovereign immunity:
1. the nature of the function performed by the employee;
2. the extent of the state's interest and involvement in the function;
3. the degree of control and direction exercised by the state over the employee; and
4. whether the act complained of involved the use of judgment and discretion.
This test focuses on the physician-patient relationship, and we find it more appropriate to address the unique situation before us. In addition to these four factors, we find that the means of compensation should be considered as well, thus adding a fifth factor to be considered. Therefore, the test to determine the employment status of doctors like Dr. Meeks for the purposes of liability under the MTCA shall be to weigh the following factors:
1. the nature of the function performed by the employee;
2. the extent of the state's interest and involvement in the function;
3. the degree of control and direction exercised by the state over the employee;
4. whether the act complained of involved the use of judgment and discretion;
5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.
¶ 21. A full and meaningful application of these factors is currently not possible under the record before us.
¶ 22. If Dr. Meeks is found to be acting as an independent contractor under the five-part test adopted in this opinion, he will not be shielded by the limitations on liability provided by the MTCA, or the defenses available under the MTCA. Likewise, Dr. Meeks would not benefit from *311 the shorter one year statute of limitations provided by the MTCA. If, however, Dr. Meeks is found to be acting as a state employee, rather than as an independent contractor under the new test, he will enjoy all of the protections and defenses available under the MTCA.

3. DID THE TRIAL COURT ERR IN GRANTING A SUMMARY JUDGMENT UNDER CIRCUMSTANCES WHICH PRESENTED A GENUINE ISSUE OF MATERIAL FACT?
¶ 23. Having heard the testimony of Dr. Meeks, the trial judge entered an order granting summary judgment consistent with a prior order he issued which apparently concluded that UMMC doctors were state employees. The tenor and rationale supporting the prior order are not developed in the record. We can not say that there are no genuine issues of material fact regarding whether Dr. Meeks was acting as a UMMC professor or in the capacity of a private doctor engaged in private practice when he treated Fox. Dr. Meeks's own testimony revealed that he regarded himself as "self-employed" while practicing at the Pavilion and earning money beyond his base salary at the hospital. The trial court itself noted that it was unsure whether Dr. Meeks was for all purposes an employee of UMMC or engaging in private practice at the time of the alleged negligence. Viewing the record in the light most favorable to the plaintiffs it is clear that genuine issues of material fact were left unresolved and that summary judgment was therefore premature. Specifically, the parties in this case have sworn to different versions of the disputed facts through their pleadings and affidavits. Therefore, summary judgment under these circumstances was not appropriate.

CONCLUSION
¶ 24. Triable issues of fact exist. We therefore reverse the judgment of the Hinds County Circuit Court and remand this case to that court for further proceedings consistent with this opinion.
¶ 25. REVERSED AND REMANDED.
PITTMAN and BANKS, P.JJ., SMITH, WALLER, COBB and DIAZ, JJ., concur.
McRAE, J., concurs in part and dissents in part with separate written opinion.
PRATHER, C.J., not participating.
McRAE, Justice, concurring in part and dissenting in part:
¶ 26. This case is about a doctor who worked at the University of Mississippi Medical Center (UMC) and who, during the course of treatment of the plaintiff, a private pay patient, allegedly committed acts of negligence injuring the patient. The trial court granted a summary judgment motion by the defendant and held that the physician was employed by UMC, and, therefore, was shielded with immunity under the MTCA. The majority reverses the trial court and holds that the physician could actually be an independent contractor due to his relationship to the patient. With this I concur. The majority goes on to adopt a test from a Virginia case, James v. Jane,[1] which analyzes certain factors to determine the employment status of a physician working at a public healthcare facility treating private-pay patients. Rather than apply this new test to the facts before the Court, the majority stops short and remands the case so that further discovery could be conducted as to the physician's employment status.
¶ 27. The record clearly indicates that the physician was acting in a "dual capacity" or at the very least as an independent contractor or that he was acting in a dual-capacity when treating the plaintiff. Even under the majority's new five-factor test, *312 the facts in the record show that he was an independent contractor vis-a-vis his private-pay patient, the plaintiff. The majority remands the case back to the trial court, but provides no further guidance as to what evidence will yield the crucial proof that the majority apparently lacks today. We already have all the facts necessary to determine his status and even if we did not the majority should still establish what facts are determinative of his status under its new test. Since failure to do so does an injustice to both parties and complicates our already complex law on independent contractors. Accordingly, I concur in part and dissent in part. Both parties are in agreement that Dr. Meeks is a member of the faculty at UMC. But there is also much evidence that shows that Dr. Meeks maintained a private practice in addition to his work as a professor at UMC. This is evidenced by his in-court admission during cross-examination, his appointment card which specifically describes his office as a "private clinic," and his tax returns in which he admits reporting taxes for income derived from the private practice of medicine. Dr. Meeks made the medical decisions as to the care and treatment of the patient as either an independent contractor while treating Fox or in a "dual capacity." He was employed by the state to teach, but acted as an independent contractor providing medical care. Since both are true, it is quite clear that Dr. Meeks was acting in a "Dual Capacity."
¶ 28. "[A]n individual may serve two masters simultaneously." Vargo v. Sauer, 457 Mich. 49, 576 N.W.2d 656 (1998). In Vargo, the Michigan Supreme Court was presented with a medical malpractice claim against a doctor and hospital. The doctor claimed he was immune from suit by virtue of the fact that he was an employee of Michigan State University. It seems that the hospital contracted with MSU to provide patient services. "MSU medical faculty received a fixed annual salary from MSU and the affiliated hospitals pay MSU the patient fees generated by MSU faculty and students." The trial court granted summary judgment finding that the doctor was immune as an employee of the university. On appeal the case was reversed and remanded. "[T]he trial court's dismissal of this action was premature because a factual issue was presented with respect to whether Dr. Sauer was acting `in the course and scope of [his] employment' solely on behalf of MSU or whether he was simultaneously operating as an agent of St. Lawrence Hospital."
¶ 29. "This Court has recognized the rule which acknowledges that a person may be an independent contractor as to certain work and a mere agent or employee as to other work for the same employer. Kight v. Sheppard Building Supply, Inc., 537 So.2d 1355, 1359 (Miss.1989); see also Carroll v. E.G. Laughlin & Sons, 220 Miss. 535, 540, 71 So.2d 461 (1954)." Russell v. Orr, 700 So.2d 619, 624 (Miss.1997).
¶ 30. There is an abundance of Mississippi cases distinguishing between the status of independent contractor and employee. See, e.g., Webster v. Mississippi Publishers Corp., 571 So.2d 946, 949 n. 3 (Miss. 1990) (containing summaries of seventeen such cases). The ultimate question in determining status is whether the physical conduct of the employee was controlled or subject to the right of control by the master. Texas Co. v. Jackson, 174 Miss. 737, 165 So. 546, 550 (1936). If the principal is concerned only with the ultimate results rather than the details of the agent's work, then the principal is not liable for the agent's acts. Fruchter v. Lynch Oil Co., 522 So.2d 195, 201 (Miss.1988).
¶ 31. This Court has previously indicated that state-employed physicians may not necessarily be employees for purposes of the Tort Claims Act, especially where they are treating patients billed separately by them. Pickens v. Donaldson, 748 So.2d 684, 688-89 (Miss.1999)[2]; See also Owens *313 v. Thomae, 759 So.2d 1117 (Miss.1999) (Where this Court ordered that further discovery be allowed to determine whether a UMC surgeon was an independent contractor or an employee). Courts from other states have also made this distinction in interpreting their sovereign immunity statutes. The Supreme Courts of Georgia, Oklahoma and Virginia have all held that state-employed physicians were not protected by sovereign immunity for negligent acts committed in the course of treatment of private-pay patients. Keenan v. Plouffe, 267 Ga. 791, 482 S.E.2d 253 (1997); Jackson v. Oklahoma Mem'l Hosp., 909 P.2d 765 (Okla.1995); Messina v. Burden, 228 Va. 301, 321 S.E.2d 657, 663 (1984); James v. Jane, 221 Va. 43, 282 S.E.2d 864, 870 (1980).
¶ 32. The majority also recognizes that other states regard these type physicians as independent contractors by its adoption of a modified version of the test used in James v. Jane, 282 S.E.2d at 870. The majority, however, does not go any further in their evaluation. They note only that now we must apply this test to determine the employment status of a physician working at a state healthcare facility and treating private-pay patients rather using the traditional "control" test. The majority now holds that we must examine:
1. the nature of the function performed by the employee;
2. the extent of the state's interest and involvement in the function;
3. the degree of control and direction exercised by the state over the employee;
4. whether the act complained of involved the use of judgment and discretion; and
5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.
While this test provides guidance for determining when a physician is acting as an employee and when he is acting as an independent contractor, the majority fails to put it into practice in the case at bar. We have all of the facts before us that are necessary to apply this test to determine whether Dr. Miller is in fact an independent contractor. The majority holds that we must send this case back for further discovery. What else must be discovered that is not before the Court today? If we are to adopt the James factors as determinative of independent contractor status, we must provide guidance on how the factors are to be applied to the facts. If we apply this new test to the facts here, there is an abundance of evidence that shows that Dr. Meeks did in fact act as an independent contractor vis-a-vis his relationship with the plaintiff. While I dissent as to remanding the case to the trial court for further discovery, a close look at the evidence in applying majority's test shows as follows:

1. The Nature of The Function Performed by The Employee
¶ 33. Both parties are in agreement that Dr. Meeks is a member of the faculty at UMC. He had two roles while working at UMC. Both parties agree that Dr. Meeks was also the primary physician providing medical care to Fox at the time of the alleged negligence. His primary function, vis-a-vis Fox was to provide medical treatment. He was also a member of the faculty at UMC and trained students. Since the alleged negligent act was one concerning his medical duties to Fox and not his administrative or professorial duties to the state, his primary function must be providing medical care to Fox.

2. The Extent of the State's Interest and Involvement in the Function
*314 ¶ 34. Since there was no instruction being performed by Dr. Meeks when the negligence occurred, the state's interest in running a medical school does not begin to outweigh its interest in ensuring the health, safety and well-being of its citizens when it offers these services and charges for them. Additionally, while the advantages of allowing faculty physicians at the UMC to form partnerships and engage in the corporate practice of medicine in order to supplement their own income from teaching may be great to the physicians, the advantage to the state is only slight. There is very little, if any, governmental interest in shielding physicians working at state healthcare institutions from liability beyond that enjoyed by others in the profession.
¶ 35. Furthermore, the mere possibility that insurance premiums could increase if the plaintiff is allowed recovery for the damages he has suffered cannot outweigh the state's interest in ensuring his right to pursue his medical malpractice action and hold those physicians accountable. The Virginia Supreme Court, the progenitors of this test, realized that interpretation was possible and addressed such misconceptions, holding:
[W]e were emphasizing the nature of the physician-patient relationship and the special undertaking, arising from that relationship, to use reasonable care. Implicit in the statement is the recognition that the state has a greater interest in preserving a patient's right to pursue a malpractice claim against a physician than in the amount of liability premiums the physician might have to pay.
Bowers v. Virginia Dep't of Transp., 225 Va. 245, 302 S.E.2d 511, 515 (1983). The value of a single state citizen's right to recovery outweighs the state's interest in reducing insurance costs.
¶ 36. The state's greatest interest in cases of malpractice committed by physicians working at state-owned health facilities is to ensure that quality healthcare is provided to its citizens. Treating these physicians as independent contractors and allowing injured patients to file suit against the doctors personally would not increase the liability of the state, but would raise the accountability of these physicians and ensure a higher caliber of medical service, therefore furthering the state's paramount interest.

3. The Degree of Control and Direction Exercised by the State over the Employee
¶ 37. Dr. Meeks's relationship to Fox was one of doctor-patient and not instructor-student. Doctors, unlike laborers, must exercise their judgment without interference from others. The Hippocratic Oath requires that the physician "use (his) power to help the sick to the best of (his) ability and judgment." Section 6 of the American Medical Association's "Principles of Medical Ethics" states, "A physician should not dispose of his services under terms or conditions which tend to interfere with or impair the free and complete exercise of his medical judgment and skill...." By the very nature of the service that Dr. Meeks provides he cannot claim that the state controls his medical discretion or treatment of patients. The state may have provided the opportunity to treat the decedent, but once the treatment was initiated Dr. Meeks's discretion supplanted the state's interest as to his medical decisions. This point was also addressed in Bowers, specifically referencing the language in the James test,
Our emphasis in James v. Jane upon the degree of autonomy and control retained by the physicians was not to demonstrate that they were disentitled to immunity because they exercised discretion, but to show that, unlike typical state employees, they were essentially private practitioners. We said that, while the doctors' state employment made possible the arrangement whereby they undertook to treat patients, "the relationship [became] the personal and confidential one of doctor and patient, not the Commonwealth of Virginia and *315 patient." 221 Va. at 50, 282 S.E.2d at 867. In the doctor-patient relationship, we stated, "the patient expects, and has a right to expect, the same care and attention from the physician that he would receive if he were in a private hospital and the physician in private practice." Id. In the typical situation where a state employee has been charged with simple negligence, the presence of discretion traditionally has been one of the indicia of entitlement to immunity. Indeed, James v. Jane recognizes this proposition, but cautions that "it is not always determinative." 221 Va. at 53, 282 S.E.2d at 869.
Bowers, 302 S.E.2d at 515.

4. Whether the Act Complained of Involved the Use of Judgment and Discretion
¶ 38. It is important to address the issue of discretion. This refers to both governmental discretion and medical discretion. Dr. Meeks was not exercising any governmental discretion at the time of the alleged negligence, but rather, as noted above, he was using his sole medical judgment to evaluate and treat the decedent. We addressed a similar issue regarding governmental discretion and sovereign immunity in Womble v. Singing River Hosp., 618 So.2d 1252. In Womble we cited to Henderson v. Bluemink, 511 F.2d 399 (D.C.Cir.1974), for the proposition that governmental immunity was created to protect flawed administrative decisions, not medical malpractice.
The chief policy underlying the creation of immunity for lower governmental officials is mainly that which stems from the desire to discourage "the fearless, vigorous, and effective administration of policies of government." However, that policy is not applicable to the exercise of normal medical discretion since doctors making such judgments would face the same liability outside of government as they would face if the complaint below is upheld. [Therefore], the threat of liability for negligence would not deter the fearless exercise of medical discretion within government service any more than the same threat deters the exercise of medical discretion outside of government. Holding government medical personnel to the same standards of care which they would face outside of government service in no way burdens their public responsibility or deters entry into government service or the vigorous exercise of public responsibility once having entered that service.

Id. at 402-403.
Womble, 618 So.2d at 1264 (emphasis added).
¶ 39. The Georgia Supreme Court also addressed this issue in Keenan, focusing on the decisions of the physician and distinguished his independent medical judgment as a healer from the governmental discretionary tasks as an administrator. That court held,
First, although it could be argued that Dr. Plouffe was in the broadest sense acting within the scope of his employment because he had an obligation as a professor at the medical college to treat patients, he had distinct obligations to Ms. Keenan that were independent of his official state duties, and the duties he is alleged to have violated in this case relate solely to those independent obligations. Here, Ms. Keenan was a private-pay patient who employed Dr. Plouffe as her medical doctor. She was billed directly for his services by the PPG, and Dr. Plouffe stated that the diagnosis and treatment of Ms. Keenan, including the use of the Argon Beam Coagulator during the surgery, were left to his sole medical discretion, and were not controlled by the government. Therefore, significantly, the duties alleged to have been violated in this case relate strictly to the medical care provided to Ms. Keenan and do not call into play what might be termed "governmental *316 considerations," such as the allocation of state resources for various types of medical care. Furthermore, Dr. Plouffe's primary duties in providing care to Ms. Keenan were to her and not to the State of Georgia.
Keenan, 482 S.E.2d at 255.
¶ 40. Dr. Meeks was not performing an administrative duty for the state; he was treating his patient using his sole medical discretion. His actions as to the specific medical decisions were not under the "control" of UMC or the state, but rather were governed by the doctor-patient relationship between he and the decedent.

5. Whether The Physician Receives Compensation, Either Directly or Indirectly, From The Patient For Professional Services Rendered.
¶ 41. Finally, there is an abundance of evidence in the record which indicates that Dr. Meeks received compensation from the patient either directly or indirectly. The detailed formulae for calculating Dr. Meeks's income, the bills which were sent directly from Dr. Meeks's office for his professional services, the 1993 and 1994 tax returns and Dr. Meeks's testimony during cross-examination regarding his income from private practice all weigh in favor of finding him to be an independent contractor.
¶ 42. This new factor the majority creates today should be considered one of the weaker ones. An example of a particularly skewed situation could be when a hospital employs a nurse anaesthetist rather than an anaesthesiologist. Both could perform the same negligent act, but only the anaesthesiologist would have the ability to bill separately for his services. Are we to say that the nurse is an employee and less qualified than the doctor is immune and that the doctor is an independent contractor, but not immune? The results of applying this new factor could therefore run contrary to the main thrust of the test which is to determine whether the physician was treating a patient or doing some administrative act.
¶ 43. The Mississippi Tort Claims Act was not intended to shield these physicians from their own negligence while they perform actions which are nothing less than private practice and line their pockets with money. Privately billing these patients shows a contract between the physician and the patient. This in and of itself is enough to lift the protections of the MTCA where malpractice has occurred.
¶ 44. We held in Quinn v. Mississippi State Univ., 720 So.2d 843, 850 (Miss. 1998), that sovereign immunity does not bar actions for breach of contract against state or political subdivisions. One wonders if the majority would apply the test, if the state (UMC) were sued for breach of contract rather than negligence.
¶ 45. Dr. Meeks's case meets all the criteria for finding him to be an independent contractor under the James test. The majority was correct to reverse this case, because Dr. Meeks was not solely an employee for the state, but in adopting the James test they should have applied it to the facts in the case at bar. Failure to explain this new test does nothing to aid the parties and the trial court and only serves to confuse an already complex area of law. Accordingly, I concur in part and dissent in part.
NOTES
[1] James was previously cited with approval by this Court in Womble v. Singing River Hospital, 618 So.2d 1252, 1264 (Miss.1993) ("The medical treatment decisions made by medical personnel at state health institutions are no different from the private medical care decisions that are currently being judged.").
[2] We noted that,

There is some evidence in the record that Drs. Donaldson and Causey may not be "employees" for the purposes of the Act. In an Attorney General's opinion cited in the physicians' brief and included as an appendix thereto, there is an explanation that staff physicians at UMC are not compensated solely by the State. Miss. Att'y Gen. Op. No. 98-0500 (Sept. 4, 1998).
Pickens, 748 So.2d at 688.